***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stephen T. Gheen and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Stephen T. Gheen with some modifications.
 ***********
The undersigned finds as fact and concludes as a matter of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The employee is John Trueba.
2. The employer is Shoe Booties Café.
3. The carrier on the risk at the time of the alleged injury by accident was Kemper Insurance Companies.
4. The employer regularly employs three or more employees and is bound by the North Carolina Workers' Compensation Act. An employer-employee relationship existed between the employer and employee on September 11, 1998, the alleged date of plaintiff's injury by accident.
5. Employee's average weekly wage is to be determined.
 ***********
Based upon all the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. As of the date of the hearing before the Deputy Commissioner, plaintiff was 42 years of age and a college graduate.
2. Plaintiff was employed full time as a night manager at his sister and brother-in-law's new restaurant, Shoe Booties Café (hereinafter "Shoe Booties"), starting employment in August, 1998. The parties did not negotiate a specified term of employment, and the length of time that plaintiff would have remained employed with Shoe Booties is uncertain.
3. It is undisputed that plaintiff's oral contract of employment provided for compensation at the rate of $125.00 per week and 15 percent of Shoe Booties' profits. Plaintiff received meals as part of his compensation. Plaintiff testified that he usually ate dinner and only occasionally ate lunch while employed with defendant. The Full Commission places a value on dinner of $14.50 per day, which is the rate in which the state reimburses for meals when employees travel. The parties offered no evidence as to the value of the meals plaintiff received and the Full Commission finds the state rate to be a reasonable value for the meals plaintiff received. Since plaintiff only occasionally ate lunch while working for defendant, the Full Commission does not make a finding with regard to the value of lunches.
4. On September 11, 1998, plaintiff suffered an admittedly compensable accidental injury when plaintiff reached for a wine glass that was falling. The wine glass broke and the stem of the glass severed the median nerve of plaintiff's left hand. The median nerve was surgically reattached, but plaintiff's left hand permanently feels as if it has Novocain in it. However, it is sensitive to touch, which the plaintiff describes as a "bizarre" sensation. Plaintiff cannot effectively grasp with the injured hand and has no fine motor function.
5. Plaintiff's treating physician, Dr. Stephen Westly of the Asheville Hand Center, assigned a 32 percent permanent partial disability rating of the left hand without any absolute restrictions.
6. Plaintiff has not requested further medical treatment or specialized care since being released by Dr. Westly.
7. Defendants do not contend that plaintiff can return to his duties as a restaurant manager with the same duties as plaintiff performed at Shoe Booties.
8. Defendants accepted plaintiff's workers' compensation claim and are paying benefits under the Workers' Compensation Act. As a part of these benefits, defendants are paying plaintiff temporary total disability benefits based upon average weekly wages of $125.00, resulting in a compensation rate of $83.33 per week.
9. Plaintiff's full time management position at Shoe Booties in August, 1998 was his only employment for the 52-week period prior to his injury on September 11, 1998.
10. Plaintiff's relevant work and educational history prior to his employment at Shoe Booties is as follows:
 a. Plaintiff was employed as a cab driver in New York City for six years, beginning at age 17. Plaintiff averaged between $15,000.00 and $18,000.00 annually at this employment.
 b. Plaintiff worked as a stone setter in New York City beginning in 1984 and ending in 1988. He earned between $25.00 and $32.00 per hour and worked 35 hours a week for approximately two-thirds of the year. For the balance of the year he would receive unemployment insurance benefits.
 c. Plaintiff moved to North Carolina during 1988. Plaintiff, who had completed the eighth grade of school prior to his employment career, obtained his GED. He then attended various schools, ultimately earning a Bachelor of Science Degree in Clinical Laboratory Sciences from Western Carolina University with a minor in Chemistry in April, 1996.
 d. In July, 1996, plaintiff began working at Chatuge Regional Hospital in the State of Georgia. He was employed in the hematology laboratory, primarily performing blood-typing matches. He worked at Chatuge Regional Hospital for approximately 14 months. Plaintiff's annual gross wages at the hospital were approximately $23,000.00.
 e. In October, 1997, plaintiff quit working at Chatuge Regional Hospital to organize a stone grinding business with his father and brother. An automobile accident involving his father ended this business venture in July, 1998. No evidence was presented as to any actual or probable earnings at this employment.
 f. Plaintiff did not seek employment until August, 1998 because he provided home health care and attendant services to his ailing father. During this period of time, plaintiff would "fill in" at Shoe Booties as an unpaid volunteer.
11. George Kerber, plaintiff's brother-in-law and a principal architect of Shoe Booties, testified that:
 a. Shoe Booties was not profitable during the approximately one month that plaintiff was employed prior to plaintiff's compensable injury.
 b. No bonuses were paid to any of Shoe Booties' managers for 1998.
 c. Shoe Booties remains in its infancy and it is still "struggling" financially, but it is becoming more profitable.
 d. As of the date of hearing before the deputy commissioner, Shoe Booties' managers are earning bonuses even though future bonuses are not guaranteed.
 e. Because calculating profits proved difficult, especially given the question of the treatment of Shoe Booties' debt obligations, managers are paid bonuses not based on profits but an arbitrary amount set by management. Shoe Booties' managers' were paid total bonuses of between $400.00 and $500.00 in 1999 and from January 1, 2000 to September 30, 2000, managers have been paid some $1,100.00 in bonuses. Bonuses are paid per fiscal quarter in one lump sum for that quarter.
 f. As of the date of trial of this action, the amounts of bonuses for the fourth quarter of 2000 were undeclared.
12. It is undisputed that if the plaintiff had remained employed at Shoe Booties he would have received bonuses had they been declared and paid by management.
13. Defendants have not included any sum for bonuses in plaintiff's average weekly wages for 1999 or 2000.
14. For the purposes of this Opinion Award, it is presumed that plaintiff is incapable of returning to his previous employment as either a lab technician or stone worker.
15. Plaintiff's average weekly wages as a stonecutter or medical lab technician would produce average weekly wages substantially greater than $125.00 per week and a resulting compensation rate substantially greater than the $83.33 that defendants are currently paying.
16. Calculating plaintiff's average weekly wages by taking his earnings for the relatively short period from the date of his employment to the date of injury and dividing those earnings by the number of weeks and parts thereof during which the plaintiff worked produces an unfair result as the plaintiff as the plaintiff was provided meals as a part of his compensation. Including bonuses that the parties had agreed to in plaintiff's average weekly wages is unfair to both parties, because there is no evidence that defendant-employer earned a profit, which was a condition precedent to the contracted bonus. Furthermore, bonuses paid after plaintiff was no longer employed by defendant-employer are not relevant.
17. Plaintiff did not proffer evidence of wages of similarly employed restaurant night managers in the western North Carolina community or region.
18. While using plaintiff's wages as a medical laboratory technician to calculate his average weekly wages would be of great benefit to the plaintiff, it would be unfair to defendants. This basis for plaintiff's average weekly wages utilizes earnings that are unrelated plaintiff's employment at Shoe Booties and, more particularly, in a distinctly separate field of employment in which the plaintiff had not been employed for approximately two years. Plaintiff had voluntarily abandoned his career path as a medical laboratory technician and there is no evidence that the plaintiff would have returned to that field of employment.
19. Defendants have not offered the plaintiff any vocational rehabilitation services as of the date of the hearing before the deputy commissioner.
20. The Full Commission finds plaintiff's average weekly wage to be $197.50, yielding a compensation rate of $131.67. The Full Commission finds the average weekly wage to be based the $125.00 weekly wage per the parties oral contract plus $14.50 per day times five days per week for dinners provided to plaintiff by defendant.
 ***********
Based on the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff's average weekly wage is $197.50, yielding a compensation rate of $131.67. "Average weekly wages" is defined as the earnings of the injured employee in the "employment in which he was working at the time of injury. . . ." N.C. Gen. Stat. § 97-2(5) (emphasis added).
2. The Workers' Compensation Act provides five formulas for calculating average weekly wages, the Act proscribing the order of preference for the method to be used. N.C. Gen. Stat. § 97-2(5);E.g, Bond v. Foster Masonry, Inc., ___ N.C. App. ___,532 S.E.2d 583 (2000).
3. Of the five statutory methods for computing average weekly wage, the first and second methods of calculating plaintiff's average weekly wages are inapplicable because plaintiff was not employed for 52 weeks prior to his injury. N.C. Gen. Stat. § 97-2(5).
4. The fourth method of calculating plaintiff's average weekly wages cannot be utilized because plaintiff has not offered evidence of persons employed in the same class of employment in the same locality or community. N.C. Gen. Stat. § 97-2(5).
5. Calculating plaintiff's average weekly wages based on his earnings as a lab technician at Chatuge Regional Hospital for the last 52-week period of employment, as contended by the plaintiff, would produce unfair and unjust results to the defendants. First, this basis for plaintiff's average weekly wages utilizes earnings that are outside the "employment in which [plaintiff] was working at the time of the injury," N.C. Gen. Stat. § 97-2(5), in a distinctly separate field of employment in which the plaintiff had not been employed for approximately two years. Second, plaintiff had voluntarily abandoned his career path as a medical laboratory technician and there is no evidence that the plaintiff would have earned the level of wages commensurate with this career absent his injury. Dereberry v.Pitt County Fire Marshall, 318 N.C. at 197, 347 S.E.2d at 817. Third, the defendants would be required to pay plaintiff compensation substantially greater than the employer ever paid plaintiff for which the defendant insurance carrier never received an appropriate premium. McAnich v. Buncombe Co. Schools,347 N.C. 126, 489 S.E.2d 375 (1997).
 ***********
Based upon the foregoing Stipulations, Findings Of Fact, and Conclusions Of Law, the Full Commission makes the following:
 AWARD
1. Plaintiff's average weekly wages shall be calculated on the basis of the weekly fixed salary of $125.00 plus the meals as negotiated between the parties as a part of the contract of plaintiff's employment, which yields an average weekly wage of $197.50 and a compensation rate of $131.67.
2. Any arrearage on temporary total disability benefits as a result of the $197.50 average weekly wage is due and owing and shall be paid in a lump sum to plaintiff subject to a 25 percent attorney fee to be paid directly to plaintiff's attorney.
3. Defendants shall pay the costs of this action.
This 22nd day of February 2002.
 S/_____________________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/_____________________________ BUCK LATTIMORE COMMISSIONER
S/_____________________________ RENEE C. RIGGSBEE COMMISSIONER